DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Seata Stephens, | ) | |
| | ) | CASE NO. 5:09 CV 682 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| City of Akron, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I. <u>Introduction</u>

This action arising under 42 U.S.C. § 1983 was initially filed in the Common Pleas Court of Summit County by plaintiff Seata Stephens ("Seata" or "Plaintiff")  in her capacity as the wife and administratrix of the estate of the deceased Jeffery L. Stephens, Sr. ("Jeffery Sr.").  The case was removed to this court by the defendants, the City of Akron ("the City"), and Akron police officers Michael Miles and Joseph Sidoti (collectively, "Defendants").

The primary event giving rise to the complaint was the shooting death of Plaintiff's husband by officers Miles and Sidoti during the early morning hours of July 5, 2008.  What began as a Fourth of July holiday celebration among family and friends morphed into an urgent 911 call, and ultimately ended with the tragic death of Jeffery Sr. under a hail of police bullets. This lawsuit ensued.

Following discovery, Defendants moved for summary judgment.  Specifically, officers Miles and Sidoti, who admit shooting the deceased 22 times in a period of three seconds, contend that they are entitled to be dismissed from this action based upon qualified immunity.

(5:09 CV 682)

Additionally, the City contends in its motion for summary judgment that Plaintiff's *Monell* claim

is without merit, and all Defendants assert statutory immunity from Plaintiff's state law claims.

For the reasons that follow, the Court concludes that officers Miles and Sidoti are not

entitled to summary judgment on qualified immunity given the conflict in the relevant testimony

regarding the facts surrounding the shooting death of Jeffery Sr.  Nor are they entitled to

summary judgment on immunity under Ohio Revised Code § 2744.03(A)(6).  The City,

however, is entitled to summary judgment, as Plaintiff's *Monell* claim fails as a matter of law,

and the City is statutorily immune from Plaintiff's state law claims.

## II.  Factual History

A.     Undisputed Facts

During a social get-together at the Stephens' home at 1000 Celina, during the early

morning hours of July 5, following a fireworks display earlier in the evening, the son of the

decedent, Jeffrey Stephens, Jr. ("Jeffery Jr."), and a social friend by the name of Reggie

Valentine, began to argue and physically tussle before Valentine departed the 1000 Celina

address.  He returned later to retrieve his daughter, who was asleep in the Stephens' home, and

the argument and cussing continued.  After Valentine left with his daughter, he returned.  The

deposition testimony of Seata Stephens follows as she describes the subsequent firing of

weapons:[1]

> Q.     Did Reggie leave with his daughter then?
>
> A.     Yes.

---

[1]Doc. 42-1, pages 33 - 44.

2

(5:09 CV 682)

Q.      And where did he go, if you know?

A.      I don't know.

Q.      You see him walking down the street with his daughter?

A.      Yes.

Q.      Did you lose sight of him?

A.      Yes.

Q.      How long is he gone before he returned?

A.      About ten minutes.

Q.      During that ten minutes what were you, Michael, Jeffrey Jr. and your husband doing?

A.      Sitting on the porch.

Q.      Are there any children who have awakened in any way and come outside or in the house awake?

A.      No.

Q.      And you're sitting on the porch doing what?

A.      Talking.

Q.      Then at some point Reggie Valentine comes back; is that correct?

A.      Yes.

Q.      What happens then, how did he get back to your house?

A.      Walked.

Q.      Did you see him coming?

A.      Yes.

(5:09 CV 682)

Q.      And was he coming down Celina from the same direction that he left?

A.      Yes.

Q.      When did you first realize it's Reggie coming back to your house?

A.      When I walked out the porch.

Q.      And what did you notice if anything about Reggie?

A.      When Reggie initially had got to the front of the house, I had already went in the house.

Q.      And this is after he returned after he took his daughter wherever he took his daughter; is that correct?

A.      Yes.

Q.      So when Reggie came back to the house you went in the house?

A.      Uh-huh.

Q.      So you at that point are inside, your husband, Jeffery Jr. and Michael are outside?

A.      Yes.

Q.      Did you hear anything that was going on?

A.      Yes.

Q.      What was going on from what you could hear from inside the house?

...

THE WITNESS:      I could hear Reggie cussing.

BY MS. RUBRIGHT:

4

(5:09 CV 682)

Q.      Could you make out who he was cussing at or what it was about?

A.      No.

Q.      How long did that go on?

A.      A minute, before I got to the front door.

Q.      When you got to the front door, what happened?

A.      <u>I opened the front door and I seen Reggie pointing a gun at little Jeff.</u>  (Emphasis added).

Q.      And where was Reggie?

A.      Right on the side of the driveway but in the grass.

...

Q.      Tell me what you see and what you hear?

A.      I hear Reggie cussing, I walk out the door and I see Reggie pointing a gun at little Jeff.

Q.      Did you say anything?

A.      No.

Q.      Did your husband say anything?

A.      I don't know.

Q.      Did Michael or Jeffery Jr. say anything?

A.      I know Jeff, little Jeff didn't, I don't know about Mike.

Q.      What happens next?

A.      From there I asked him to leave and he pointed the gun at me.

5

(5:09 CV 682)

Q.      Do you know what kind of gun it was?

A.      No.

Q.      Where were you when he pointed the gun at you?

A.      The front porch.

Q.      Was your husband there?

A.      Yes.

Q.      Was Michael there?

A.      Yes.

Q.      And Jeffery Jr.?

A.      Yes.

Q.      Are those the only individuals that were there that observed this happen, to your knowledge?

A.      Yes.

Q.      When he points the gun at you, what did you do?

A.      Run in the house.

Q.      Where did you go?

A.      Upstairs to retrieve my weapon.  (Emphasis added).

Q.      And when you say you went upstairs to retrieve your weapon, where was it?

A.      In a safe.

Q.      And where is the safe?

A.      In my room.

6

(5:09 CV 682)

Q.      Was it loaded?

A.      No.

Q.      Did you take the time to load it?  Did you have to get bullets from somewhere and then load your weapon with bullets?

A       The clip was already loaded.

Q.      So you just had to put a clip in the gun?

A.      Yes.

Q.      And what kind of gun do you own?

A.      A .40 caliber.

Q.      A model or type?

A.      Smith & Wesson.

...

Q.      You come downstairs then with the gun I assume, what was your intent?

A.      To scare him off.

Q.      Tell me what you did?

A.      I walked out the door, he seen I had the weapon to my side and he started firing.

Q.      When you walked out the door, did you tell him you had a gun?

A.      Yes.

Q.      What did you say to him?

A.      I told him to leave because I had my gun.

7

(5:09 CV 682)

Q.      What did Reggie say if anything?

A.      I don't remember if he said anything.

Q.      What did he do?

A.      Fired his weapon.

Q.      Where did he fire it?

A.      I'm not sure.

Q.      Did he lift, do you recall if he lifted his hand and shot it in the air or shot at the ground or shot at your house?

A.      Huh-uh.

Q.      You don't know?

A.      I know he lifted his arm but I don't know where it went.

...

Q.      When you went in the house, for all intents and purposes you don't know what happened to Reggie?

A.      Huh-uh, no.

Q.      And what happened next?

A.      Called the police.

...

From the time Seata solicited assistance from the Akron Police Department by a 911 call until her husband was shot and killed, less than 3 minutes expired.  The Akron Police Department Report of Investigation involving the shooting contains a description of the relevant

8

(5:09 CV 682)

radio transmissions and times recorded by the Akron Communications Center as follows:[2]

> 0439 hours, 32 seconds - A 9-1-1- call comes in from Seata Stephens who states that a person named "Reggie" is outside shooting at her house at 1000 Celina Ave.  The call then disconnects.

> 0440 hours, 32 seconds - Car 10, Officers Hill and Edelyn are dispatched to 1000 Celina Ave. for a suspicious person shooting a gun.  Car 7, Officers Sidoti and Miles notify the dispatcher that they are responding as well.

> 0440 hours, 42 seconds - A call back is made to 1000 Celina Ave. to obtain further information on the original call.  Seata Stephens is screaming and gives a physical and clothing description of the person named Reggie whom she states has fired six shots at her house.  She also states, "I had to fire back to protect my family." The call taker tells her that the police are on their way.

> 0441 hours, 27 seconds - A second 9-1-1 call comes in from Rosa Dortch who reports that someone is shooting on Celina Ave.  She also states that she heard people arguing and specifically mentions hearing "Jeff's" name.

> 0442 hours, 29 seconds - During the above 9-1-1 call from Rosa Dortch, both she and the call taker hear a three-second, rapid burst of several gunshots..

> 0442 hours, 33 seconds - Officer Sidoti calls out a "Signal 5" emergency traffic for an officer involved shots fired call.  He is yelling, "put your hands out, put your hands out!"  Officer Sidoti also requests for a medical unit to respond to the scene.  Multiple units call out that they are responding.

> 0443 hours, 51 seconds - Officer Sidoti reports that everyone is handcuffed and the scene is secured.  He makes another request for a medical unit for a male with gunshot wounds, and is told that EMS is on the way.

---

[2]Docket 45-4 (Akron Police Department Report of Investigation), partial pages 9 and 10.

(5:09 CV 682)

It is beyond dispute that when Jeffery Sr. and his son left the residence at 1000 Celina,

moving in the direction of the departed Reggie Valentine, that Jeffrey Sr. had possession of the

firearm that Seata had previously used in an attempt to scare off Valentine.[3]

B.      Disputed Facts

1.      The Police Interview of Defendant Police Officer
        Joseph Sidoti and His Subsequent Deposition

The Akron Police Department took a statement from Officer Sidoti on July 8, 2008.[4]

In summary, Officer Sidoti, during the police interview, described the shooting as

follows:[5]

> Whiddon:      OK.  When the subject, now you know, you've seen
> the gun and he starts to turn, is it, what you described to us is
> turning away from you?
>
> Sidoti:       Yes, sir.
>
> Whiddon:      OK.  What are you thinking at that point?
>
> Sidoti:       I'm thinking that he's drawing the gun and he's
> facing towards officer Miles.  He's going to shoot him.
>
> Whiddon:      OK.  What happened next?
>
> Sidoti:       I started shooting.
>
> Whiddon:      OK.  Do you have any idea how many times you

---

[3]*See* the deposition of Jeffrey L. Stephens, Jr., (Doc. 42, page 22) where Jeffrey indicates
that his father got control of the firearm from his wife after his wife Seata Stephens had
fired the weapon into the ground following the shooting by Reggie Valentine.

[4]Doc. 45-3.

[5]Doc. 45-3, page 8.

10

(5:09 CV 682)

> shot?

> Sidoti:          I guess like four or six, maybe.

Officer Sidoti was subsequently deposed on Monday, October 5, 2009, and he described the shooting in the following colloquy:[6]

> ...  I know he was going for the gun because of the way he buckled and the way that his right hand made that motion towards the gun as he was turning.

> Q.      That's your conclusion, that he was going for the gun.

> A.      I know it, sir.

> Q.      Did you command him to drop the gun?

> A.      There was no time, at the speed -- and he made this movement at full speed.  It was -- I think the best way to describe it was athletic, there was no time for anything else at the rate that he was going.  I had to -- had to shoot or he would have got the gun out and --

> Q.      The gun never came out.

> A.      Because of what I did.

> Q.      You shot him before you even saw the gun out.

> A.      I shot him because he was going for the gun and turned in the direction of Officer Miles.

> Q.      *At no time did Mr. Stephens ever point that weapon at you or Officer Miles?*

> A.      *Because of what I did, because I shot him, he did not get the chance.*

---

[6]Doc. 45, pages 14 through 15.

(5:09 CV 682)

> Q       You acted proactively?
>
> A.      I acted in the defense of Officer Miles.  Like I said, I'm trying to describe how fast he was moving and how critical --
>
> Q.      Did Mr. Stephens Senior have any confrontation with Officer Miles?
>
> A.      There was no chance, sir.

> 2.      The Police Interview of Defendant Police Officer
>         <u>Michael Miles and His Subsequent Deposition</u>

The Akron Police Department officials took a statement from Officer Miles on July 8, 2008, three days after the fatal shooting.[7]

During the July 8, 2008 interview, the following colloquy took place:[8]

> Miles:          I hear Officer Sidoti go get on the ground, get on the ground.  And I *heard* him shoot.
>
> Whiddon:     OK.  When you heard Officer Sidoti first yell get on the ground, what did you see?
>
> Miles:          I saw ... I couldn't see because the son was between me and Sidoti.  Sidoti was off to his left a little bit.  So I can ... the older gentlemen [sic] was behind Sidoti so I couldn't really see what was going on with the older male that got shot.  But I saw Joe walking towards him yelling get on the ground, get on the ground.
>
> Whiddon:     OK.  Did you ... This older guy he's talking to, did you have any idea why Joe, officer Sidoti was saying that to this guy?
>
> Miles:          I had no idea.  I couldn't see.  I could just see that he was turning away and I saw the back shoulder blades of him.  So I could see above his head and that he was turning, facing

---

[7]Doc. 45-4.

[8]Doc. 45, pages 7 through 10.

(5:09 CV 682)

away.

Whiddon:    OK.  And what happened next?

Miles:    I immediately went around to the right of the son and then ... Mind if we use the diagram?

Hudnall:    Yeah, that would be good.

Whiddon:    At this point ...

Miles:    That's the son and here is the gentlemen [sic] that got shot.  Officer Sidoti was in this area.  I was back in this area.  Officer Sidoti said get on the ground, get on the ground.  And that's when he engaged him.  I came around to the right of the gentlemen [sic] that got shot and that's when I began firing.

\* \* \* \* \*

Whiddon:    OK.  What happened next?

Miles:    The reason I fired at the subject, I can remember seeing the butt of a gun.  I can't remember, I remember his hand was near it.  <u>I don't know if he was holding it and then the next thing I remember is the gun in his hand.  I can't remember which hand it was in, the left or the right.</u>  All I remember was the gun was in his hand.  Then the last thing I remember is he was on the ground and I could still see that the gun was still in his control. (Emphasis added).

Whiddon:    OK.  What do you mean when you say the gun was still in his control?

Miles:    The gun was no more than two to three inches from his hand.

Whiddon:    OK.  And once again when you first saw the gun, it was in his hand?

Miles    <u>I can remember distinctly seeing the gun in his hand, yes.</u>  (Emphasis added).

13

(5:09 CV 682)

> Whiddon:  OK.  What happened next?
>
> Miles:  Officer Sidoti maintained cover on that gentlemen [sic].  I walked up to the gentlemen [sic] and I kicked the gun away from him so it was out of his reach.  And I turned my attention to the son who is laying on the ground facing south.

During the Miles deposition taken on October 5, 2009, some 15 months after the fatal shooting, the following colloquy took place:[9]

> Q.  Did you hear shots fired?
>
> A.  I *never heard* shots fired.
>
> Q.  At all?
>
> A.  I can't remember hearing shots fired, no.  Even when I was shooting my weapon I don't remember hearing shots.
>
> Q.  And what was the position of Stephens Senior when you discharged your firearm, was he standing up, was he going down?
>
> A.  He was standing up.
>
> Q.  And you don't recall hearing Sidoti shooting his firearm at him?
>
> A.  I remember him yelling, and I *can't for certain say I heard a shot, no.*
>
> * * * * *
>
> Q.  Did you know whether or not Jeffery Stephen Senior is responding to the commands of Patrolman Sidoti to get on the ground?
>
> A.  He was definitely not responding to the commands, he was still standing.

---

[9]Doc. 45, pages 12 through 13.

14

(5:09 CV 682)

> Q.      He made a turn, did he not?
>
> A.      He made a very quick turn, his head and shoulders moved very quick.
>
> Q.      That's when you discharged your firearm, correct?
>
> A.      Negative.  I didn't discharge my firearm until I saw a gun in his hand pointed at me.
>
> Q.      *So it's your testimony his gun was in his hand pointed at you?*
>
> A.      *It was in his hand pointed directly at me, yes.*

3.      <u>The Relevant Deposition Testimony of Jeffrey L. Stephens, Jr.</u>

In addition to providing the information that his father had obtained the firearm from his mother, Jeffrey Jr. describes the arrival of the police cruiser with the two officers, that Jeffrey Jr. and his father informed the officers that the shooter had gone in a certain direction, and that subsequently, Jeffrey Jr. was ordered to the ground, handcuffed and then heard the shots in a period of three seconds that resulted in the shooting-death of his father.  The relevant testimony of Jeffrey Jr. regarding the firearm that his father had obtained from his mother follows:[10]

> Q.      Okay.  Do you have any discussion with your father at any point in time regarding the handgun while the officers are inside the cruiser?
>
> A.      No.
>
> Q.      You don't tell him anything such as throw the gun away, ditch the gun?
>
> A.      Yes.

---

[10]Doc. 42, page 30, line 16 through page 31, line 11.

15

(5:09 CV 682)

>Q.      Put it away?

>A.      Yes.

>Q.      You do tell him that?

>A.      Yes.

>Q.      Now, at this point in time does your dad still have the handgun in his hand?

>A.      No, it's on the devil strip, the grass.

>Q.      You're saying that the gun is in the devil strip?

>A.      Yeah.

>Q.      He's not holding it?

>A.      No.

    4.      The Relevant Deposition Testimony of Edna R. Jennings,
<u>a Resident in the Vicinity of the Stephens Property</u>

Edna Jennings was deposed on April 30, 2010 and indicated on the day of the shooting

she lived at 1015 Celina and was awakened by shots in the area.  Her relevant testimony

follows:[11]

>Q.      Okay.  Now, at this point let me take you to the early morning hours of July 5th, 2008.  And do you recall hearing a disturbance or an incident that occurred in the early morning hours?

>A.      Yes.

---

[11]Doc. 42-5, page 9, lines 6 through page 13, line 15; page 14, line 3 through page 15, line 17; page 17, line 12 through page 18, line 22.

(5:09 CV 682)

Q.      What did you hear?

A.      Shooting down by his house.

Q.      You heard some shooting down by?

A.      Jeff's house.

Q.      And that would be 1000 Celina?

A.      Yes.

Q.      Did you hear several gunshots?

Q.      I heard two.

Q.      And what did you think was occurring?

A.      I didn't know, I was in the bed, I just slid on down in the bed.

Q.      Okay.  You were in bed, you heard a few gunshots, did that prompt you to get up and see what was going on?

A.      Right.

Q.      And what did you do?

A.      I got up and looked out the window and I seen a guy go up the street and I didn't see him good and then I seen Jeff, I seen older Jeff and his son and another boy going up the street.

Q.      So you saw three people going up the street, which would be Celina?

A.      Right, up towards, Thornton.

Q.      Thank you, up towards Thornton.  So three people, you saw one individual and approximately how long was it until you saw the second individual head up Thornton -- or Celina?

A.      It was a good little distance.  I could see them both at one

17

(5:09 CV 682)

time but I barely seen him because he ran past.

Q.    So what order did you see, you saw one individual run by, then who was the second individual, do you recall?

A.    Older Jeff.

Q.    It was older Jeff and then you saw another individual?

A.    His son.

Q.    His son?

A.    And then there was another guy lingering on back.

Q.    And this is after you heard some shots down at Jeff Stephens, Sr.'s house?

A.    Right.

Q.    Okay.  Do you know Jeff Stephens Jr.?

A.    Yes.

Q.    Jeff's son?

A.    Uh-huh.

Q.    Jeff Jr., we'll call him for purposes of this deposition, he was one of the individuals who was heading --

A.    Towards Thornton Street.

Q.    -- towards Thornton Street up Celina?  And do you recall what he was wearing that night?

A.    I believe it was a white T-shirt, I believe it was a white T-shirt.

Q.    Do you recall what Jeff Stephens Sr. was wearing?

A.    No, not exactly.

18

(5:09 CV 682)

Q.      Okay.  So once you see these individuals pass by your house, what do you do?

A.      Just looked out the window.  They was mumbling but I couldn't make out what they were saying.

Q.      Mumbling, could you tell what they were saying?

A.      No, just walking up the street mumbling, wasn't talking real loud.

Q.      Did you see if any of these individuals that passed your house had a firearm in their hands?

A.      No, I did not.

Q.      You couldn't see.  Where were you looking from, are you at your bedroom window?

A.      Yeah.

Q.      Is this a two story house?

A.      Yes.

Q.      And your bedroom is on the second story?

A.      Right.

Q.      And in the front of the house?

A.      Yeah, facing Celina.

Q.      Facing Celina, okay.  You see the individuals pass, you hear some mumbling, okay, do you go back to bed at this point in time?

A.      No, just set up in the window, look out the window.

Q.      You just look out the window?

A.      Yes.

19

(5:09 CV 682)

Q.      And then what do you?

A.      I see an officer's car come from towards Manchester across Thornton with no lights on and two officers, two officers jump out the car and tell then to get down on the ground.  Little Jeff gets down on the ground but big Jeff don't, they said the second time to get on the ground and that's when I heard gunshots.

...

Q.      So two officers get out, could you see the two officers talking to Jeff Jr. or did the two officers split up?

A.      No, they was together.

Q.      Okay.  So the two officers went and talked to who first?

A.      They didn't, they set by their car and told them to get down, get down, to both of them.

Q.      So Jeff Stephens Jr., he gets down?

A.      Right.

Q.      Do you recall when he gets down, does he get face down?

A.      Right.

Q.      Do you recall if his head is facing towards Thornton?

A.      No, I don't know, he was just head down.

Q.      And you're stating that Jeff Stephens Sr. did not get down?

A.      No, not the first time, no.

Q.      And what do the officers do?

A.      They just stood there and then next thing I heard they started shooting, I jump back from the window when I heard the shots.

20

(5:09 CV 682)

Q.      Was Jeff Stephens Sr., could you hear him saying anything to the police?

A.      No.

Q.      You just heard several shots go off?

A.      Right.

Q.      And are you able to observe this from your vantage point, these shots going off?

A.      Right.

Q.      And who were they shooting at?

A.      At the older Jeff.

Q.      Okay.  And what happens?

A.      He fell.

Q.      He fell, once he was shot he fell to the ground?

...

Q.      When you saw Jeff Jr. and his father go up the street on Celina toward Thornton, you indicated that the police got out of the car, did you see if the police had their guns drawn?

A.      No, they didn't.

Q.      When they told the two Stephens to get on the ground, you indicated that Jeffery Jr. went down, correct?

A.      Right.

Q.      And then you said that Jeffery Sr. did not go down?

A.      No, not the first time.

Q.      Did they then tell them to get down a second time?

21

(5:09 CV 682)

A.      Yes.

Q.      And did he start to go down on the ground?

A.      Yes, he did.

Q.      I'm sorry?

A.      Yes, he did.

Q.      And when did the police start shooting him?

A.      When he started going down.

Q.      So when the police officers started shooting Jeff Sr., it's your testimony he was in the process of going down on the ground?

        MR. DEFIBAUGH:   Objection.

        THE WITNESS:      Yes.

BY MR. FRIEDMAN:

Q.      Was he moving toward the ground?

A.      Yes, he was.

Q.      Could you tell whether or not he was responding to their orders?

        MR. DEFIBAUGH:   Objection.

        THE WITNESS:      Yes.
        MR. FRIEDMAN:     Nothing further, thank you.

BY MR. DEFIBAUGH:

Q.      Ms. Jennings, you testified that Jeff Sr. upon the second order was going down.  You don't know if he was going towards the ground?
A.      Yes, he was, I do know he was going towards the ground.

22

(5:09 CV 682)

Q.      You do know he was going towards the ground?

A.      Yes.

Q.      Do you know, when he was going towards the ground, do you know

        which way he was moving, was he moving to his left?

A.      No, just going straight down.

Q.      Going straight down?

A.      Straight down.

    5.  Summary of the Relevant Factual Disputes in the Context of the Fatal Shooting

It is apparent that there are material facts in dispute in connection with the fatal shooting.

First, there is a factual dispute as to whether the decedent was armed at the time of the shooting.  The decedent's son testified that his father threw the gun down as the police approached.  Officer Sidoti contends that the decedent had a firearm in his waistband and declared that the gun never came out prior to the shooting.  Officer Miles was ambivalent about the firearm when initially questioned by the Akron Police Department, at first unable to recall whether Jeffery Sr. was holding the gun at all, and then, apparently remembering seeing him hold it, unable to recall which hand it was in.  At no point during the interview did he mention that Jeffery Sr. aimed the gun at him.  Deposed fifteen months later, Miles declared that the decedent had the gun in his hand pointed at Miles.  Finally, contrary to the officers' testimony that Jeffery Sr. refused to comply with their commands, Ms. Jennings declared that the decedent was part-way down to the ground in response to the officers' declaration to "get down" when the

(5:09 CV 682)

officers began shooting.[12]

### III.  Discussion

#### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact issue is "material" only if it could "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

A principal purpose of the summary judgment procedure is to "isolate and dispose of factually unsupported claims."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  The party moving for summary judgment bears the burden of demonstrating the absence of genuine issues concerning material facts.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970). The court must, therefore, regard the opposing party's evidence as true where supported by affidavits or other evidentiary material, *Celotex*, 477 U.S. at 324, and draw all reasonable inferences in favor of the nonmovant, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

#### B.  Individual Liability Under 42 U.S.C. § 1983

The individual defendants maintain that qualified immunity shields them from liability for Plaintiff's § 1983 claim.  The doctrine of qualified immunity protects "government officials .

---

[12]Doc. 42-5, page 18, lines 3 through 10.

24

(5:09 CV 682)

. . from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982).  "[I]f officers of reasonable competence could disagree on

[the legality of the action], immunity should be recognized," *Malley v. Briggs*, 475 U.S. 335, 341

(1986), but "[i]f no reasonably competent officer would have taken the same action, then

qualified immunity should be denied," *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007).

The plaintiff bears the burden of showing that the defendants are not entitled to qualified

immunity.  *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

Qualified immunity involves a two-part inquiry.  First, the court asks whether, when

resolving all factual disputes in favor of the party asserting the injury, the evidence suffices to

show that the defendant's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194,

201 (2001).  If the plaintiff meets the first part of the test, the court next asks "whether the right

was clearly established . . . in light of the specific context of the case."  *Id.*  "For a right to be

clearly established, the contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right."  *Feathers v. Aey*, 319 F.3d 843, 848

(6th Cir. 2003).  The defendant's good faith or subjective belief in the legality of the action is

irrelevant.  *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  "Although the application of

qualified immunity comprises a legal issue, summary judgment is inappropriate when conflicting

evidence creates subordinate predicate factual questions which must be resolved by a fact finder

at trial."  *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).  The court may approach the

two-part inquiry in any order it deems appropriate.  *Pearson v. Callahan*, 129 S.Ct. 808, 818

25

(5:09 CV 682)

(2009).

    1. <u>Constitutional Violation Inquiry</u>

Plaintiff claims that Defendants are not entitled to qualified immunity because their conduct violated Jeffery Sr.'s clearly established Fourth Amendment right to be free from unreasonable use of force by a police officer. "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

In such cases, the question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.  This determination "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting in part *United States v. Place*, 462 U.S. 696, 703 (1983)).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"The intrusiveness of a seizure by means of deadly force is unmatched," and qualifies as reasonable only if "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 9, 3. Three factors guide the court's assessment of the reasonableness of the officer's use of force: (1)

(5:09 CV 682)

the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight.  *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006).

Accepting Plaintiff's version of events as true, the degree of force employed by the officers was not objectively reasonable.  Here, whether the officers had probable cause to perceive a serious threat of harm depends on the resolution of numerous factual disputes.  In Plaintiff's version, Jeffery Sr. committed no serious crime, was unarmed, and had begun to comply with the officers' commands to get down on the ground.  Under such circumstances, the officers lacked any basis for believing the Jeffery Sr. posed a significant threat, making their decision to use deadly force objectively unreasonable.  Indeed, "as a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers."  *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008).  Because Plaintiff has produced adequate evidentiary support for her version of events and the Court is bound to accept that version as true for purposes of deciding the motion, summary judgment is not appropriate.

Defendants arguments to the contrary are unpersuasive.  Throughout their briefs, Defendants persist in failing to view the facts in the light most favorable to Plaintiff.  Most notably, they refuse to accept Jeffery Jr.'s testimony that he told his father to jettison the gun and saw it laying in the nearby lawn just prior to the shooting.[13]  Thus, the officers' discordant

---

[13]

 Defendants argue that accepting Jeffery Jr.'s testimony on this point does not preclude summary judgment because Jeffery Jr. complied with the officers' instructions to get down on the ground and was facing away from Jeffery Sr. when the shooting occurred, and thus might have missed Jeffery Sr. retrieving the gun from the lawn before encountering the police.  The court finds this argument unpersuasive.  Neither officer

(5:09 CV 682)

insistence that Jeffery Sr. was in fact armed and (depending on whether you believe Sidoti or Miles) either reaching for the gun or pointing it at Miles, "is simply irrelevant to [the] determination of 'whether a constitutional right would have been violated on the facts alleged' by [Plaintiff]." *See Floyd*, 518 F.3d at 407 (quoting *Saucier*, 533 U.S. at 200).  Similarly irrelevant is the officers' contention that Jeffery Sr. refused to comply with their orders to get on the ground.  Ms. Jennings, an eyewitness to the incident, testified that Jeffery Sr. responded to the officers' second admonition by moving straight down toward the ground when he was shot. Jennings's account gives rise to a reasonable inference that Jeffery Sr. was complying with the officers' commands, rather than resisting them, as the officers contend.  In light of these predicate factual disputes, the reasonableness factors—severity of the crime, threat to the officers, and resistance by the suspect—cannot be balanced in Defendants' favor at this stage, and must await resolution by a jury.

The officers' conflicting accounts of the incident further cloud the factual picture.  Sidoti testified unequivocally that he shot Jeffery Sr. in an effort to defend Officer Miles, firing just as Jeffery Sr. was reaching for the gun, preventing Jeffery Sr. from ever aiming at Miles.  In his

---

testified to seeing Jeffery Sr. rummaging in the lawn just prior to their arrival; on the contrary, both claimed that the gun was tucked in the waistband of Jeffery Sr.'s shorts when they arrived on the scene.  Crediting Jeffery Jr.'s testimony, the amount of time that elapsed between when he saw the gun lying in the lawn and the shooting was miniscule—a few seconds at most. Thus, while a metaphysical possibility exists that Jeffery Sr. threw the gun in the lawn just as the cops arrived, and then picked it back up and tucked it in his waistband while they were getting out of the car (all without Jeffery Jr. or the officers noticing), that scenario is highly implausible in light of the existing testimony, and certainly much less plausible than the competing inference created by Jeffery Jr.'s testimony—that Jeffery Sr. discarded the gun upon his son's suggestion and was unarmed when the officers shot him.

28

(5:09 CV 682)

interview shortly after the shooting, Miles claimed that he saw the butt of a gun, then saw the gun in Jeffery Sr.'s hand, and essentially could not remember what happened after that.  During the entire interview, Miles never once mentioned that Jeffery Sr. aimed the gun at him.  Then, at his deposition taken 15 months later, Miles testified confidently that he fired after seeing Jeffery Sr. point the gun directly at him.  While the court recognizes the rapidly developing nature of the encounter, this is not a "minor conflict of perception," *see Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 773 (6th Cir. 2004); rather, the officers' competing versions of the shooting simply cannot co-exist.  Sidoti's account leaves no room for the gun to have been pointed at Miles, since he testified to shooting Jeffery Sr. as soon as he perceived a movement toward the gun, leaving Jeffery Sr. no chance to draw the weapon, let alone aim it at Miles.  This conflict casts doubt on the officers' credibility, lending additional support for Plaintiff's version and bolstering the need for a jury determination of the disputed facts.  *See Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) (where the immunity question turns on disputed issues of fact, "[i]t is the province of the jury, not the court, to decide on the credibility of the defendant's account of the need for force").

The case analogies Defendants draw further reflect their refusal to view the facts in the light most favorable to the Plaintiff.  In their reply brief, Defendants rely on two unpublished decisions, *Wolfanger v. Laurel County, Ky.*, 308 F. App'x 866 (6th Cir. 2009), and *Burnette v. Gee*, 137 F. App'x 806 (6th Cir. 2005), to support their invocation of qualified immunity.  But acceptance of the facts favoring Plaintiff's version of events renders both *Wolfanger* and *Burnette* distinguishable.

29

(5:09 CV 682)

In *Wolfanger*, the police responded to a 911 call the plaintiff made following a minor family dispute with her husband.  During the call, she told the dispatchers that her husband was armed with a handgun, depressed and on pain medication, and might be a danger to himself or others.  After the plaintiff's daughter directed the officer to the area where the husband was standing, the officer approached the suspect and ordered him to drop his weapon.  The husband told the officer to get off his land, and then, according to the officer, raised his right hand and pointed the gun at him.  The officer fired a single shot, hitting the husband in the abdomen and causing injuries that subsequently led to his death.  The wife filed a § 1983 action alleging excessive force, and the district court granted the officer's motion for summary judgment.  On appeal, the Sixth Circuit affirmed, finding that the district court correctly determined that no genuine issue of material fact existed because the plaintiff failed to present any evidence contradicting the officer's assertion that the husband pointed a gun at him.  *Wolfanger*, 308 F. App'x at 867.  The plaintiff's only effort to dispute the officer's telling consisted of the daughter's testimony that she saw the decedent carrying his cane shortly before the shooting, which the officer could have mistaken for the gun.  The Sixth Circuit rejected this argument, concluding that it did not conflict with the officer's testimony that the decedent aimed the gun using his right hand because he could have had both the gun and the cane (which could stand on its own or be looped over the arm) on the right side of his body at the same time, and the officer and the decedent were alone when the shooting occurred.

The instant case is distinguishable on numerous fronts.  *Wolfanger* is a typical case where the death of the suspect left the officer as the only witness to the shooting.  The officer's account

30

(5:09 CV 682)

therefore stood unrebutted by definition. Here, by contrast, Jeffery Jr. was walking with his

father when the police stopped them, and remained present at the scene throughout the incident.

Jeffery Jr. told his father to discard the gun and claims he saw it lying in the lawn just before the

shooting. In *Wolfanger*, on the other hand, the officer knew before he arrived that the decedent

was armed, and no evidence suggested that he made any attempt to discard the weapon. Nor was

there any evidence that the decedent attempted to comply with the officer's command to drop the

gun, whereas in this case Ms. Jennings testified that Jeffery Sr. obeyed the officers' directions to

get on the ground just before he was shot. Thus, the undisputed evidence in *Wolfanger*

demonstrated that the officer knew, prior to the encounter, that the suspect was armed and

potentially dangerous, and that, when confronted, the suspect resisted police orders and aimed a

gun at the officer, all of which prompted the officer to fire a single shot. In this case, construing

the facts in Plaintiff's favor, the officers confronted an unarmed individual who had committed

no serious offense and began complying with their orders, and responded to the situation by

firing twenty-two bullets at him in a three-second span. Having presented significant evidence

contradicting the officers' account of the shooting, Plaintiff succeeds where the plaintiff in

*Wolfanger* failed, successfully carrying her burden to defeat the officers' motion for summary

judgment on qualified immunity.

*Burnette* is similarly inapposite. That case began with an urgent 911 call placed after a

family member discovered Don Mark Wilson unconscious in his trailer after attempting suicide

by ingesting an overdose of prescription medication. When the paramedics arrived, they called

for police assistance. A paramedic entered the trailer, found Wilson awake and sitting on the

31

(5:09 CV 682)

bed, and tried to get him to go the hospital.  Wilson refused and, according to the paramedic,

grabbed a rifle.  When the paramedic told Wilson that law enforcement was on its way, Wilson

said "he would shoot anyone who tried to take him away."  *Burnette*, 137 F. App'x at 807.

Sheriff Gee arrived and learned that a suicide was in progress, that the suicidal subject was

armed and had threatened the paramedic.  Although Wilson's mother and her husband were

present when Sheriff Gee entered the trailer, they quickly exited, leaving Gee and Wilson alone.

The officer repeatedly asked Wilson to surrender the gun, but Wilson refused and threatened to

kill himself.  When Wilson set the gun down and reached to put on his shoe, Sheriff Gee saw an

opening, drew his gun, and charged toward Wilson in an attempt to disarm him.  Wilson picked

up the gun and pointed it at Sheriff Gee, who grabbed it and tried to wrestle it away.  Unable to

do so and believing his life was in danger, Sheriff Gee shot Wilson four times.  Wilson died from

the gunshot wounds.

　　　　Invoking § 1983, Wilson's mother sued on behalf of his estate.  Because Wilson was

deceased and thus could not offer a competing version of the facts, the district court accepted

Gee's account as true and found that the officer did not violate Wilson's Fourth Amendment

rights.  The Sixth Circuit affirmed, finding "no reasonable basis for overturning the district

court's finding that Wilson reached for or raised his rifle and struggled with Sheriff Gee over the

weapon, and that as a consequence, Sheriff Gee reasonably feared for his life when he shot

Wilson."  *Id.* at 810.  Like *Wolfanger*—and unlike the case at bar—*Burnette* is another

straightforward case where the police officer is the only witness who lives to tell about the

shooting.  There, the undisputed facts established that the officer knew the suspect was armed

32

(5:09 CV 682)

and dangerous and that, when confronted, the suspect pointed a rifle at the officer and fought with him for possession of the gun.  Those facts left no genuine issue regarding the reasonableness of Sheriff Gee's decision to employ deadly force.  Here, factual disputes bearing on the reasonableness inquiry abound, precluding summary judgment in the officers' favor.

Finally, the legitimately undisputed facts Defendants properly rely upon for support—that the two men were walking at a brisk pace, single-file, away from the site of the reported shooting; Jeffery Jr. was shirtless (which, in the officers' experience, was indicative of involvement in a fight); and both men exhibited an excited demeanor—fall far short of justifying the use of deadly force.  As stated previously, the Constitution prohibits the police from shooting an unarmed, nondangerous suspect, *Floyd*, 518 F.3d at 407, with the danger presented by a suspect judged "based on the facts known to the officer at the time of the incident, not on hindsight."  *Jefferson v. Lewis*, 594 F.3d 454, 461 (6th Cir. 2010).  "[O]nly in rare instances may an officer seize a suspect by use of deadly force."  *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (quoting *Whitlow v. City of Louisville*, 39 F. App'x 297, 302–03 (6th Cir. 2002)).  In short, the undisputed facts fail to establish that Jeffery Sr. presented a danger sufficient to justify the officers' use of deadly force; a jury must resolve these factual disputes to determine whether this case presents one of those rare instances.  Because "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).

2. Clearly Established Inquiry

The law clearly establishes that an officer may not use deadly force to seize an unarmed

33

(5:09 CV 682)

suspect. Taking Plaintiff's allegations as true, when the officers shot Jeffery Sr.: (1) he was not armed; (2) he had committed no serious offense; (3) he was in the process of complying with the officer's commands; and (4) he did not present an objectively reasonable threat to the safety of the officers or anyone else. Following the Supreme Court's decision in *Garner*, the Sixth Circuit has repeatedly held that a reasonable officer would understand that he is not entitled to shoot a person who does not pose an immediate threat. *See Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988) ("At the time of the shooting it was clearly established in the Sixth Circuit that Yates 'had a right not to be shot unless he was perceived to pose a threat to the pursuing officers or to others."); *Green v. Taylor*, 239 F. App'x 952, 960 (6th Cir. 2007) ("*Garner* clearly establishes the right at issue; that is, the right not to be shot unless the suspect poses an immediate threat to the officers or to others."); *Floyd*, 518 F.3d at 407 ("a suspect's right to be free from the use of excessive force is clearly established."). Under these circumstances, the asserted constitutional violation was clearly established.

Because Plaintiff presents a conflicting versions of the facts that, if proven, would establish a violation of clearly established constitutional rights, the Court concludes that the officers are not entitled to summary judgment on the issue of qualified immunity.

C. Municipal Liability Under 42 U.S.C. § 1983

Defendants also move for summary adjudication of Plaintiffs' § 1983 claims against the City of Akron. To prevail on a § 1983 claim against a municipality, a plaintiff must show: (1) that he or she suffered a deprivation of a constitutionally protected interest; and (2) that the

34

(5:09 CV 682)

deprivation was caused by an official policy, custom, or usage of the municipality. *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978). Municipal liability for unconstitutional acts of employees cannot be established on the basis of respondeat superior, but rather requires proof that the municipality's policy or custom caused the harm. *Id.* at 694.

First, Defendants argue that the *Monell* claim fails because Plaintiff cannot demonstrate an underlying constitutional violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Due to the existence of genuine issues of material fact as to the underlying constitutional violation, this argument lacks merit.

Second, Defendants assert that Plaintiff has failed to produce any evidence of a relevant city policy or practice that would support *Monell* liability. Eschewing the accusation in her complaint that the City failed to adequately train its officers in the use of deadly force, Plaintiff instead premises her *Monell* claim the City's alleged failure to: (1) train its officers on obtaining descriptions of suspects; and (2) train its 911 dispatch operators to handle to reports of a shooting and to relay descriptions of suspects to the responding officers.

Inadequate police training can support municipal liability "only where the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Such conditions arise when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390.

35

(5:09 CV 682)

By linking her *Monell* claim to the officers' alleged failure to obtain, and the dispatcher's alleged failure to supply, a description of Valentine, Plaintiff dooms her claim as a matter of law. Even assuming that the dispatcher was not properly trained to handle such an emergency situation, and that a properly trained dispatcher would have, as Plaintiff asserts, relayed Seata's description of Valentine to the officers, that information would not have affected this case.

Officers Sidoti and Miles rushed to the scene in response to Seata's initial 911 call, which Seata ended by hanging up, and during which she did not give the dispatcher a detailed description of Valentine.  The officers arrived on the scene and stopped Jeffery Sr. and Jeffery Jr. very shortly after receiving the dispatch, less than a minute later.  Meanwhile, the dispatcher called Seata back and, during this second conversation, received a description of Valentine.  But the tape recording of this second call contains the sounds of the gunfire that killed Jeffery Sr., not long after Seata supplied the description.  Thus, even with the description in hand, in this case the dispatcher had no time to relay it to the officers quickly enough to aid them in their seizure of Jeffery Sr.  In order to prevail on a *Monell* claim, "[t]here must be a 'direct causal link' between the policy (or lack of policy) and the alleged constitutional violation such that the [municipality]'s 'deliberate conduct' can be deemed the 'moving force' behind the violation." *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 361 (6th Cir. 2001)).  Because a properly trained dispatcher could not have radioed the description of Valentine to the officers prior to their encounter with the decedent, Plaintiff cannot establish that the alleged failure to train caused the constitutional injury she complains of.

36

(5:09 CV 682)

And the officers certainly were under no constitutional duty to sit in the police cruiser until they received a detailed description of the suspect.  Responding to reports of shots fired, the officers encountered Jeffery Sr. and Jr. walking hurriedly and excitedly away from the scene. While the reasonableness of the quantum of force they used to effectuate the seizure remains subject to determination pending the resolution of disputed facts, the reasonableness of the officers' decision to initiate the stop lies beyond question.  *See Terry v. Ohio*, 372 U.S. 1, 30–31 (1968).  The use of deadly force was either justified or not, depending on the threat Jeffery Sr. posed, but regardless of how a jury resolves those factual disputes, there is no contention that the officers shot Jeffery Sr. in a case of mistaken identity, believing him to be the assailant that prompted the 911 call; they shot him because, they claim, he was aiming a gun at them; his estate counters, with supporting proof, that he was unarmed and compliant.  A jury will decide what the circumstances were and whether the officers acted reasonably.  But having reasonably initiated the stop outside the cruiser in the middle of the street, the officers were in no position to utilize the description Seata eventually provided to prevent Jeffery Sr.'s death.  Accordingly, Plaintiff's *Monell* claim fails because she cannot establish that the officers' lack of a description acted as the moving force behind the alleged constitutional violation.

D.  State Law Claims

In addition to the federal claims brought under § 1983, Plaintiff also asserts wrongful death and survivorship claims against the City and the officers under Ohio law.

The City argues that Ohio Revised Code § 2744.02(A)(1) cloaks it with immunity from such state law torts.  That section provides that "a political subdivision is not liable in damages

37

(5:09 CV 682)

in a civil action for injury, death, or loss to person or property allegedly caused by any act or

omission of the political subdivision or an employee of the political subdivision in connection

with a governmental or proprietary function."  The provision or nonprovision of police and

emergency services qualifies as a "governmental function."  Ohio Rev. Code § 2744.01(C)(2).

The City is a political subdivision and Plaintiff's asserted injuries all stem from the performance

of governmental functions.  The specific exceptions described in § 2744.02(B) circumscribe §

2744.02(A)'s broad grant of immunity, but Plaintiff does not argue that any of them apply here.

Accordingly, the City is entitled to statutory immunity from Plaintiff's state law claims.

Officers Sidoti and Miles claim immunity under § 2744.03(A)(6), which extends

immunity to all employees of a political subdivision for actions taken in connection with a

governmental or proprietary function unless the employee's conduct was malicious, in bad faith,

or wanton or reckless.  Ohio Rev. Code § 2744.33(A)(6)(b).  Ohio law defines wanton and

reckless conduct as

> perversely disregarding a known risk, or acting or intentionally failing to act in
> contravention of a duty, knowing or having reason to know of facts which would
> lead a reasonable person to realize such conduct creates an unreasonable risk of
> harm substantially greater than the risk necessary to make the conduct negligent.

*Chesher v. Neyer*, 477 F.3d 784, 797 (6th Cir. 2007) (quoting *Webb v. Edwards*, 165 Ohio App.

3d 158, 166 (Ohio Ct. App. 2005)).

The factual disputes that preclude summary judgment on Plaintiff's § 1983 claims against

the officers likewise prevent summary judgment on the state law claims.  Based on the facts

presented by Plaintiff, a reasonable jury could find that the officers shot an unarmed Jeffery Sr.

while he was in the process of complying with their commands.  As a result, a genuine issue of

(5:09 CV 682)

material fact remains as to whether the officers acted in a wanton and reckless manner.  *See Reed*

*v. City of Cleveland*, No. 1:04CV0546, 2006 WL 3861082, at *18–19 (N.D. Ohio Sept. 6, 2006)

(citing *Alley v. Bettencourt*, 134 Ohio App. 3d 303, 314–315 (Ohio Ct. App. 1999)).

Accordingly, the officers' motion for summary judgment on the state law claims is denied.

IV.  <u>Conclusion</u>

Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

The City of Akron is entitled to summary judgment on all claims asserted against it.  The claims

against officers Sidoti and Miles remain pending and shall proceed.

The Court will conduct a status conference in this case on September 17, 2010 at 12:00

noon for the purpose of scheduling a trial date.

IT IS SO ORDERED.


  July 26, 2010                                          */s/ David D. Dowd, Jr.*
Date                                                     David D. Dowd, Jr.
                                                         U.S. District Judge

39